**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**CASE NO.**

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

KRISTOPHER A. LUNSFORD,
AKL TRANSPORT LLC, and
SOUTHERN TRUCK LEASING LLC,

Defendants.
______________________________________/

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**
**AND DEMAND FOR JURY TRIAL**

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## I. INTRODUCTION

1. The Commission brings this action to enjoin Kristopher A. Lunsford ("Lunsford") and his companies AKL Transport LLC ("AKL Transport") and Southern Truck Leasing LLC ("Southern Truck Leasing") (collectively, "Defendants") from committing further violations of the anti-fraud provisions of the federal securities laws for operating a $127 million Ponzi scheme victimizing hundreds of investors throughout the United States.

2. From at least May 2023 through approximately May 2025 (the "Relevant Period"), Defendants fraudulently offered and sold truck-leasing investment contracts to approximately 765 investors nationwide, including many in the Tampa, Florida area.

3. During the Relevant Period, Defendants represented that they would use investors' funds to purchase commercial semi-trucks and operate all aspects of the commercial trucking business including finding drivers and sourcing cargo loads. Defendants also told investors they owned and operated approximately 2,000 trucks.

4. In exchange for investors agreeing to fund the truck leasing business, Defendants promised a net weekly return of $1,250 per truck assigned to them for a five-year investment term—equating to approximately 260% annually on the required $25,000 initial investment. Defendants led investors to believe that the returns came from the fees charged to carriers for transporting their loads.

5. These statements were demonstrably false. Contrary to their representations, Defendants misused at least $52 million—approximately 40% of investor deposits—to pay earlier investors. Lunsford diverted approximately $33 million—about 25% of investor funds—for personal use, including nearly $10 million in cash withdrawals, approximately $6.2 million for travel, bars, and nightclubs, and at least $1.9 million in casino-related expenses. Moreover,

Defendants' claim of operating approximately 2,000 trucks was materially overstated.

6. Defendants knew or should have known that their representations about the use of investor funds, promised returns, and number of trucks, among other things, were false.

7. By engaging in the conduct alleged in this Complaint, Defendants have violated and unless enjoined, are reasonably likely to continue violating, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## II. DEFENDANTS

8. **Lunsford**, age 46, resides in Dacula, Georgia. Lunsford formed AKL Transport and Southern Truck Leasing in 2023 and was each company's sole member. As sole member, he exercised complete control of both companies throughout the Relevant Period. He established each company's principal office at the same address in Dacula, Georgia, which was also his residence. Moreover, as the authorized signatory for each company's bank accounts, he controlled the bank accounts and managed deposits, withdrawals, and transfers during the Relevant Period.

9. **AKL Transport** is an active Georgia for-profit limited liability company with its principal place of business in Dacula, Georgia. AKL Transport purportedly specialized in trucking and logistics and offered an investment program to investors.

10. **Southern Truck Leasing** is an active Georgia for-profit limited liability company formed with its principal place of business in Dacula, Georgia. Southern Truck Leasing purportedly operated a truck-leasing business.

## III. JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)]. Furthermore, Defendants have consented to the Court's jurisdiction.

12. This Court has personal jurisdiction over Defendants and venue is proper in the Middle District of Florida because (a) a substantial part of the acts, communications, and transactions giving rise to the violations of the Securities Act and the Exchange Act occurred in this District, including in-person solicitations and presentations to investors, and (b) many investors reside in this District. For instance, Lunsford personally solicited investors in the Tampa, Florida area, including people he met at bars and nightclubs, and he pitched approximately 20 prospective investors at a barbershop in this District.

13. In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV. FACTUAL ALLEGATIONS

### A. Defendants' Business and Securities Offerings

#### *1. Defendants' Business*

14. Lunsford formed AKL Transport and Southern Truck Leasing in 2023 ostensibly to operate a trucking and logistics company throughout the United States. During the Relevant Period, Defendants offered investments in a truck-leasing program that Lunsford promoted and operated through AKL Transport and Southern Truck Leasing. AKL Transport purported to operate as an interstate, for-hire carrier of general freight, and Southern Truck Leasing purported to purchase, lease, and maintain the commercial trucks used by AKL Transport.

15. Lunsford and external sales agents operating at his direction told investors that Southern Truck Leasing would use their initial investment to purchase semi-trucks at auction at a discount. Southern Truck Leasing would then prepare the trucks for use by AKL Transport in connection with its trucking and logistics business. Once Southern Truck Leasing's trucks were operational, AKL

Transport would contract with commercial carriers to transport their loads on the trucks for a fee. AKL Transport would then pay investors a fixed weekly return from fees generated by their assigned truck(s).

16. More specifically, investors made their initial investment as follows: investors, through limited liability companies they often created at the direction of Lunsford, executed three agreements required by Lunsford: (1) a lease agreement with Southern Truck Leasing; (2) a transportation agreement with AKL Transport; and (3) a maintenance agreement with Southern Truck Leasing and/or AKL Transport (collectively, the "Agreements"). Lunsford executed the Agreements on behalf of AKL Transport and Southern Truck Leasing. After signing the Agreements, investors wired their initial investment deposit to AKL Transport directly or through the external sales agents.

17. Under the lease agreement, Southern Truck Leasing purported to own the semi-truck that investors leased and agreed to cover maintenance of the truck if investors signed on with AKL Transport. Lunsford told investors that within six to eight weeks of the investment, Southern Truck Leasing would purchase, register, insure, and otherwise prepare the truck leased by the investor so that it could be used in AKL Transport's trucking operations. Pursuant to the lease agreement, investors agreed to pay Southern Truck Leasing $700 per week

over a five-year period with a lump sum payment of $5,600 at the end of the lease for each truck they leased from Southern Truck Leasing.

18. Under the transportation agreement, AKL Transport was to dispatch Southern Truck Leasing's trucks with carriers. AKL Transport was supposed to identify and contract with carriers to transport their freight on the leased trucks for a fee. Based on the fees generated by the trucks leased by investors, AKL Transport would pay investors a total of $1,950 per week ($700 of which investors were required to pay as lease payments to Southern Truck Leasing). Thus, under the terms of the investment contract, investors were to receive a weekly net return of $1,250.

19. Under the maintenance agreement, Southern Truck Leasing and later AKL Transport agreed to maintain trucks and provide verifiable maintenance records. Lunsford promised investors consistent returns even if their truck was not in service so long as a certain percent of the fleet was operating. Investors bore no responsibility for any service-related issues.

20. The Agreements offered and sold to investors were investment contracts and therefore securities within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)]. Investors made an investment of money by wiring funds into bank accounts that Lunsford controlled—they made their $25,000 initial

investment to AKL Transport's bank account, and their weekly $700 lease payment to Southern Truck Leasing's bank account. Defendants pooled and commingled these funds and exercised complete responsibility in running and managing the truck leasing business—from purchasing, registering, insuring, and maintaining trucks to dispatching them with carriers.

21. Investors had no role in selecting, inspecting, or maintaining the truck(s) Defendants assigned to them and they had no role in finding commercial loads, drivers, or customers. Instead, investors relied entirely on Defendants' efforts to handle these duties and responsibilities and looked to Defendants to generate any profits or returns in the business. Investors took only minimal steps such as signing documents, wiring funds, and making lease payments.

**2. *Defendants' Investor Solicitations***

22. Defendants solicited investors in-person, through online ads, and through telephone or virtual conference calls that highlighted the truck leasing program as passive, safe, and yielding large returns. Early investors consisted of individuals Lunsford knew personally or whom he met at bars and nightclubs in the Tampa, Florida area. He also pitched approximately 20 prospective investors at a barbershop in central Florida.

23. Lunsford also recruited and directed external sales agents to solicit investors through social media advertising such as Facebook ads, Instagram posts,

and YouTube videos which touted the investment as passive, safe, and yielding large returns. Lunsford worked closely with these sales agents to solicit investors. For example, Lunsford directed the sales agents to conduct investor presentations and to create and disseminate social media posts and offering materials to prospective investors.

24. Lunsford also furnished the sales agents with the information they used to prepare the offering materials provided to prospective investors which described the investment. He also edited and approved PowerPoint presentations used by the sales agents to pitch investors and frequently participated in virtual conference calls with prospective investors organized by the sales agents. Together with these sales agents, Defendants solicited around 765 investors to invest in the fraudulent securities offering herein and raised approximately $127 million.

## B. Defendants' Violations of the Anti-Fraud Provisions of the Federal Securities Laws

### *1. Material Misrepresentations*

25. In connection with the offering of securities, Defendants made numerous material misrepresentations to investors about, among other things, the use of investor funds and the number of trucks Defendants operated.

a. Use of Investor Funds and Source of Investor Returns

26. Defendants and their sales agents repeatedly and consistently represented to investors during the Relevant Period that their money would be used to purchase and prepare trucks for commercial operation and they would receive a fixed return of $1,250 net per week per truck(s) assigned to them—approximately a 5% net return per week and an annual net return of 260% of their typical investment of $25,000 for a five-year term. Defendants also told investors that the net weekly return of $1,250 for each truck came from the fees AKL Transport charged carriers for transporting their loads on Southern Truck Leasing's trucks.

27. For example, in a PowerPoint presentation to investors, Defendants, through their sales agents, touted "Low Risk" and "Fast Returns" and agreements with several American carriers. One sales agent that Lunsford recruited posted a YouTube video indicating the ability to make a 108% return through investing with Defendants.

28. Defendants, however, failed to deploy investor funds as promised to acquire trucks or prepare them for commercial operation. Nor did their purported investment opportunity generate "Fast Returns" or a 108% return. Instead, bank records show that investors' returns were fueled by new investor money rather

than legitimate business revenue wherein Defendants diverted approximately $52 million in investor funds to pay earlier investors.

29. Defendants never disclosed to investors the use of new investors' funds to pay earlier investors.

b. <u>Misrepresentations About the Number of Trucks</u>

30. Defendants and their sales agents touted Defendants' commercial truck fleet as having approximately 2,000 trucks.

31. Defendants falsely represented that AKL Transport operated as many as 2,000 trucks, and the number of trucks in the fleet was material to investors. In truth, AKL Transport's own records identified far fewer trucks, and the lease agreements provided to investors reflected only a small portion of the 2,000 trucks Defendants claimed. Numerous lease agreements issued to different investors contained duplicated VINs, further demonstrating that Defendants' representations about the size of AKL Transport's fleet were false.

**2. *Scheme to Defraud***

a. <u>Defendants Misused Investor Proceeds to Make Ponzi Payments</u>

32. Defendants represented to investors that their returns came from the fees AKL Transport charged carriers for transporting their loads on Southern Truck Leasing's trucks. However, Defendants' bank records reflect that the truck

leasing program and commercial trucking operation incurred significant losses, and Defendants used investor funds to cover the shortfall.

33. Defendants' bank records reflect that less than $3 million in Defendants' accounts during the Relevant Period appeared to come from legitimate business revenue or proceeds. This was insufficient to cover purported returns paid to investors. Instead, Defendants diverted at least $52 million of investor funds—approximately 40% of investor deposits during the Relevant Period—to make Ponzi payments.

b. <u>Lunsford Misappropriated Millions of Dollars of Investor Funds</u>

34. At Defendants' direction, investors wired their initial investment deposit to AKL Transport's bank account and thereafter their lease payments to Southern Truck Leasing's bank account, both of which were solely controlled by Lunsford.

35. During the Relevant Period, Lunsford diverted at least $33 million of these investor funds for his own personal use. For example:

a. Lunsford withdrew almost $10 million in cash through ATM withdrawals and over-the-counter withdrawals; and

b. Lunsford spent approximately $1.9 million in gambling expenses at casinos, $3.5 million on travel, and $2.7 million on bars and nightclubs.

### *3. Defendants' Scheme Unravels*

36. Many investors stopped receiving payments in March 2025. After Defendants began missing payments, some investors requested to take possession of the trucks leased without result.

37. Lunsford told many investors that the missed payments were the result of bank wiring issues and told others that several million dollars in his accounts had been frozen due to a purported bank-fraud investigation. By April 2025, Defendants stopped responding to investor inquiries and requests. By approximately May 2025, the Ponzi scheme had collapsed: AKL Transport's bank accounts no longer had sufficient funds to continue paying investors absent new investor money.

## V. CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 17(a)(1) of the Securities Act
### (Against All Defendants)

38. The Commission repeats and realleges Paragraphs 1 through 37 of this Complaint.

39. By engaging in the conduct described herein, and as alleged in Paragraphs 32 through 37 above, during the Relevant Period, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or

indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

40. By reason of the foregoing, Defendants, directly or indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**COUNT II**

**Violations of Section 17(a)(2) of the Securities Act**
**(Against All Defendants)**

41. The Commission repeats and realleges Paragraphs 1 through 37 of this Complaint.

42. By engaging in the conduct described herein, and as alleged in Paragraphs 25 through 31 above, during the Relevant Period, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

43. By reason of the foregoing, Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III

**Violations of Section 17(a)(3) of the Securities Act**
**(Against All Defendants)**

44. The Commission repeats and realleges Paragraphs 1 through 37 of this Complaint.

45. By engaging in the conduct described herein, and as alleged in Paragraphs 32 through 37 above, during the Relevant Period, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

46. By reason of the foregoing, Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT IV

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)**
**(Against All Defendants)**

47. The Commission repeats and realleges Paragraphs 1 through 37 of this Complaint.

48. By engaging in the conduct described herein, and as alleged in Paragraphs 32 through 37 above, during the Relevant Period, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

49. By reason of the foregoing, Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)] thereunder.

**COUNT V**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against All Defendants)**

50. The Commission repeats and realleges Paragraphs 1 through 37 of this Complaint.

51. By engaging in the conduct described herein, and as alleged in Paragraphs 25 through 31 above, during the Relevant Period, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52. By reason of the foregoing, Defendants, directly and indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

**COUNT VI**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c)**
**(Against All Defendants)**

53. The Commission repeats and realleges Paragraphs 1 through 37 of this Complaint.

54. By engaging in the conduct described herein, and as alleged in Paragraphs 32 through 37 above, during the Relevant Period, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.

55. By reason of the foregoing, Defendants, directly and indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)] thereunder.

## VI. RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests the Court find Defendants committed the violations alleged, and

### A. Permanent Injunction Against Defendants

Issue permanent injunctions enjoining Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### B. Conduct-Based Injunction Against Lunsford

Issue a conduct-based injunction enjoining Lunsford from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, from participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

### C. Disgorgement and Prejudgment Interest Against Defendants

Issue an order directing Defendants to disgorge all ill-gotten gains or proceeds received with prejudgment interest thereon, resulting from the acts and/or courses of conduct alleged in this Complaint, pursuant to Sections 21(d)(3), (d)(5), and (d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (5), and (7)].

**D. Civil Money Penalties Against Defendants**

Issue an order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**E. Further Relief Against Defendants**

Grant such other and further relief as may be necessary and appropriate.

## VII. DEMAND FOR JURY TRIAL

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated: September 24, 2026

Respectfully submitted:

By: */s/ Michael C. Mikulic*
Michael C. Mikulic
Trial Counsel
Fla. Bar No. 125073
Direct: (305) 982-6353
Mikulicm@sec.gov
*Lead Counsel*

Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300